## HENRY GREW *vs.* ANDREWS BREED & others.

Under the Rev. Sts. *c.* 36, § 31, which provide that "the holders of stock in any bank, at the time when its charter shall expire, shall be liable, in their individual capacities, for the payment and redemption of all bills which may have been issued by said bank, and which shall remain unpaid, in proportion to the stock they may respectively hold at the dissolution of the charter," it was *held,* that a holder of bank bills purchased by him as trustee, is entitled to maintain a bill in equity, in his own name, withou joining the *cestui que trust,* against the stockholders, for himself, and for all othe holders of unpaid bills.

*Held also,* that one who buys bank bills of a broker, at a discount, under an agreement to keep them from circulation for a certain time, is entitled to the statute remedy against the stockholders, for the full amount of the bills, unless he has notice, when he buys them, that they are improperly issued by the officers of the bank; but that such a sale to him, by a broker, is not evidence of such notice.

*Held also,* that when bills of the bank are sold by its officers, on a usurious contract, a subsequent *bona fide* purchaser of them is entitled to recover of the stockholders the full nominal value thereof, without any deduction on account of the usury in the sale by the officers of the bank.

*Held also,* that an agreement by a bank, with a holder of its bills, to convey prop erty to him in payment thereof, which agreement is not executed, by reason of an injunction on the bank and the placing of its assets in the hands of receivers, does not impair the bill holder's remedy against the stockholders.

*Held also,* that when the assets of the bank are placed in the hands of receivers, the holders of its bills, who do not present their claims to the receivers, cannot recover of the stockholders the full amount thereof, but only the balance which they would have been entitled to recover, if they had proved their claims before the receivers, and obtained part payment.

*Held also,* that bill holders are not entitled to recover interest of stockholders on unpaid bills.

*Held also,* that those who hold stock as collateral security, and those who hold it in trust, whether the trust does or does not appear on the books of the bank, are liable for the payment and redemption of unpaid bills; and that administrators of deceased stockholders are so liable, in their representative capacity as for other debts of their intestates.

THIS was a bill in equity, brought by the plaintiff, for himself and all other holders of bills of the Nahant Bank, which were unpaid on the 19th of April 1837, (when its charter was repealed by *St.* 1837, *c.* 214,) against the holders of its stock at that time.

The facts of the case appear in the opinion of the court.

The first argument was had at March term 1844, by *B. R. Curtis,* for the plaintiff, and by *Greenleaf & Gardiner,* for the defendants. The opinion of the court, on the points then argued, was delivered on the 1st of July 1844, by

48 *

SHAW, C. J.   In this bill, the plaintiff alleged that he was the holder of certain bills of the Nahant Bank, at the time of the dissolution of its charter, which have not been paid in full from the assets of the bank, and that the defendants were stockholders in said bank at the time of the dissolution of its charter ; and he seeks in behalf of himself and of others, creditors and holders of the bills of said bank, to charge the defendants, as such stockholders, to an amount sufficient to pay the balance due to such holders of bills.

At the argument, several questions were raised upon points similar to those that were raised in the case of *Crease* v. *Babcock*, (*ante*, 525,) which had not then been decided, but upon which an opinion has since been expressed.   So far as those decisions go, they are to be considered as affirmed, and applied to the present case.

The principal question now to be considered is, whether the plaintiff Grew, at the time of the commencement of this suit, had such an interest as a bill holder of said bank, at the time of its dissolution, that he could maintain a suit in equity on the statute, to recover of the stockholders, in proportion to the amount respectively held by them at the time of the dissolution, the balance due to him as a holder of its bills, after receiving his dividend, in proportion with other creditors, of the assets of the bank.

1. The first objection is, that he was not a holder of their bills, in his own right, but only as a trustee for others, and that as such trustee he could not maintain such suit, or, that if he could, he could not do so, without joining those, who stood in the relation of *cestuis que trust*, as parties.

It appears by the evidence, including the answers of the plaintiff to a cross bill filed in the case, calling upon him for a discovery upon this subject, that he purchased these bills of a broker, and has always retained them ; that he presented them to the bank for payment, and payment was refused.   He further states that he purchased them partly on account of his brother Edward, since deceased, and whose administrator he is, and partly for account of his sister, then

or afterwards married to Mr. James C. Alvord, who has since deceased.

We entertain great doubt whether, if this beneficial interest in his brother and sister had continued, it would have been necessary to make them parties with him in this suit. He was the holder, having the sole legal interest. The object was simply to reduce the property to possession, and the subject matter of the suit is negotiable bank notes payable to bearer, and expressly intended to pass from hand to hand with the utmost freedom, where the possession of the note is legal evidence of title, and of which the holder can always give a valid discharge on payment, by a simple surrender of the note. But the object of making a *cestui que trust* a party is to bind his interest, and to enable the adverse party, on compliance with the decree, to be fully exempt from all claims from the *cestui que trust*. If, therefore, it appears that all such beneficial interest is extinguished, so that, before a decree made, the plaintiff is the legal owner, and also the entire owner of the beneficial interest, it removes the objection. Now, it does appear on the evidence that the plaintiff has become the administrator of his brother Edward, and that his sister, Mrs. Alvord, has relinquished to him all her right and interest in the bills; and this extinguishes their beneficial interest, and vests the whole legal and equitable interest in him.

2. Another ground of objection on the part of the defendants is, that they are not answerable, because these and many other of the bills of the Nahant Bank were disposed of clandestinely, by fraud and collusion with the directors and officers of the bank, to the injury of the stockholders; that the plaintiff and other holders did not receive them in good faith, as money or currency, but by collusion, with a knowledge that they were so clandestinely issued, and in fraud of the stockholders.

This is a fact to be proved by the defendants alleging it; and upon the fullest examination, and a careful scrutiny of the evidence, we are satisfied that it is not proved. The plaintiff purchased these bills of a broker at a discount, and Bolles, the

broker, testifies that so far from disclosing to the plaintiff that he was selling these bills on account of the bank, he gave the plaintiff no information, except that he represented that the bank was of good standing and credit.   But he further testifies, that he did not know or understand that he was acting for the bank, but supposed he was acting for Breed and Chase, who brought him the bills to negotiate on their account, and to whom he paid the money for the proceeds.   This is strongly corroborated by the testimony of Breed and Chase, and by the answers of the plaintiff to the cross bill.   He admits that it was understood between himself and Bolles, that the bills should not be put into circulation for six months, or, if they were so put into circulation and went into the bank within that time, he would redeem them.   It is argued that this is evidence from which the plaintiff must necessarily have inferred that Bolles was acting as agent for the bank.   But we are not satisfied that this is a necessary inference.   We can easily conceive that individuals, taking such notes, may have an interest in keeping them from circulation, and be willing to make a discount upon them, in order to raise the money without putting them into circulation for a limited time ; and therefore it by no means follows that a broker, who is employed so to negotiate large bank notes, is employed by the bank or by agents acting for account of the bank.   Supposing, therefore, that such a contract, if made directly with a bank, would be void as against the policy of the laws regulating banks and banking, and that it would be held not only that such an agreement to withhold the bills from circulation would be void, but also that the bills themselves would be void, (which is the strongest view for the defendants,) it would not follow that such bills would be void in the hands of a subsequent holder taking them without actual or constructive notice.

It is agreed on all hands, that this limited and qualified statute liability of stockholders to make good any ultimate loss, which might happen to those persons holding their bills at the time of the dissolution of the bank, should the assets of

the bank be insufficient to redeem them, was intended to give greater security and credit to bank bills than to any other species of negotiable contracts. But it would be a heavy clog upon the circulation of bank notes as currency, if each party taking them could be deprived of his resort to this statute liability of stockholders, by their showing that the bills were irregularly, clandestinely or corruptly issued by the officers intrusted by the corporation with the power of issuing them. Nothing short of collusion with such fraudulent officers, or actual notice of their fraudulent dealing, and some participation in it by the party seeking this remedy, can deprive him of it. The fact that bank bills are taken of a broker at a discount, and on an agreement that they shall not be put into circulation within a limited period, at a time of great scarcity of money, when many and various financial expedients were resorted to, both by individuals and by corporations, is not constructive notice to one taking them, that they were issued clandestinely by the officers and not by the full authority of the banking corporations.

3. Another objection taken to the plaintiff's claim and right to maintain this action is, that in the summer of 1838, Mr. Alvord, being then the owner of the bills, or acting as agent for the owner of them, endeavored to get a settlement with the bank, and, after considerable negotiation, came to an agreement to receive the amount in some property which the bank were to give him, with six per cent. interest. This comes from the testimony of Mr. Davis, who was cashier of the bank. He states that Mr. Alvord's proposal was to take security and give the bank time ; the bank, on the other hand, offered to pay him in property, and this offer was the substance of the bargain finally made. This was agreed to be done between Mr. Alvord and the bank, and he was to come to the bank at a subsequent time, and consummate the bargain ; but before the time arrived, an injunction was laid upon the bank, and then nothing could be done. Strictly speaking, this point is not raised by the bill and answer ; but it was considered *de bene esse*, with an understanding that if the court should think

it material, such amendments of the pleadings might be made, as to put it in issue and enable the parties, if necessary, to go into a more full investigation of the facts. But we are of opinion that whatever the bargain was, and supposing Mr. Alvord fully authorized to make it, it could not avail the defendants, as an answer to this suit. If indeed the bargain had been carried into effect and the notes surrendered, then this claim could not exist; but that is not suggested. Then it is very obvious, that the agreement, as stated, was an accord without satisfaction, which was clearly no bar to the demand against the bank. Or, to state substantially the same ground in a little different aspect, it was an agreement to surrender the notes and release the claim for the payment of them, on condition of being paid in specific property, which, being a condition precedent, was never complied with on the part of the bank, and the promise, by its terms, became inoperative.

But the strength of the defendants' argument is, not that this inchoate and unexecuted agreement discharged the bank, but had the effect to give them time; and that, as the defendants are in the nature of sureties, the case is brought within the principle, that giving time to the principal exonerates the surety.

It is difficult to perceive how this unexecuted agreement gave time to the principal. There was a proposal to take security and give time, but that never ripened into an agreement. The agreement, as made, was to take property in satisfaction; but no time was given to accomplish it, and had it been a valid agreement and made on good consideration, the right of the holder to use legal diligence in securing the notes, would not be suspended, till delivery or tender of the property conformably to the agreement. And who can doubt that such tender would have been gladly accepted?

But supposing that in point of fact there had been an agreement by which time would be given to the bank, the principle relied on would not apply. It is said that nothing is so apt to mislead as a simile. The qualified liability of stockholders for the unpaid bills of the bank, after its dissolution,

does establish a relation like that of principal and surety, in some respects ; but it differs in others, and especially in that particular which renders the principle in question applicable. The liability of the stockholders does not commence until the termination of the bank charter, and after other funds for paying the bills of the bank have failed. Is it a discharge of such a statute liability, that the holders of bills have, at an anterior period, and whilst the bank was in operation, taken collateral security and resorted to other means to obtain satisfaction of the bank, which have proved unavailing ? One of the principal grounds upon which it is held that giving time to a principal is injurious to the surety, and so is held to discharge him, is, that it enlarges and extends his liability beyond the time originally stipulated, and he is entitled to the benefit of the maxim *non in hæc fædera veni.* By giving time, the surety is prevented from paying the debt himself, and seeking an immediate reimbursement, by suit against the principal. But all this is manifestly inapplicable to the case of these stockholders, in their relation to the bank, because, as they were not sureties at the time of the supposed act of giving time, it did not extend their liability, or enlarge the period of its continuance, to their detriment. Such an agreement, therefore, for enlarging the time of payment, had it been made by the bank, would not have varied the liability of the stockholders for such bills as remain outstanding and unpaid, at the time of its dissolution.

4. It was made a question whether the plaintiff could bring this suit for himself and other holders of bills standing upon a similar footing, and having similar claims. This question was fully considered in the case of *Crease* v. *Babcock,* in which it was held, not only that he might, but that he must so frame his bill. All who are entitled to claim must sue as plaintiffs, or be allowed to come in and prove their claims before the master on a suit brought by some for the benefit of themselves and others ; because, though their claims are several, the fund liable for them is limited, and may be insufficient to pay the whole ; and then they must divide the fund in proportion

to the amount of their respective claims as holders of bills having an equal and common right to the fund. And so, in like manner, we think that all who are liable must be made defendants ; for, although they are severally liable and in different proportions, it is a liability to contribute to a common fund, for the payment of certain claims of the plaintiffs; and if the whole amount for which all the stockholders are liable is not required to satisfy the full claims of the bill holders, then the defendants will be liable to contribute to the common fund such proportion of the amounts for which they may be held liable, as will be sufficient to satisfy the claims of bill holders, as actually established by the result of the suit. In no other way can the just proportion be established, which the plaintiffs are respectively to recover, if the fund is insufficient to satisfy them, or the proportion which the defendants are to contribute, in case the fund is more than sufficient to satisfy the claims upon it.

5. Some questions have arisen as to the liability of the different defendants, in consequence of some peculiarity in their situation ; and, for the convenience of the court, they are divided into classes. The *first* are absolute owners of stock, at the time of the repeal of the charter of the bank. About the liability of these, there is no doubt or question. The *second* class consists of those who were absolute owners of part of the stock held by them, and special holders of the residue ; that is, they held part of the stock as collateral security only, or in trust for others, who furnished the money to pay for it, but the shares stood in their own names on the books of the bank. These holders are chargeable in the same manner as if they were absolute owners of all the stock standing in their names. The *third* class are holders of stock as trustees for others, and the trust appears on the books of the bank, either by its being there stated that the owners hold in trust for some person named, or by the owner's being described as administrator. These also are chargeable, like the two former classes. The *fourth* class consists of those who hold stock as administrators of deceased stockholders.

They are chargeable, as for other debts of their intestates, in their representative capacity.

The case is to be sent to a master, who will make his report, as soon as may be, so that the court may come to a final decree as early as is practicable.

---

The master's report was returned at March term 1845, and both parties took exceptions thereto, which were argued by *B. R. Curtis*, for the plaintiff, and by *Greenleaf & Gardiner*, for the defendants. The opinion of the court was delivered on the 4th of April 1845, by

SHAW, C. J. This case having been referred to a master, it now comes before the court again, upon exceptions taken by both parties.

1. The plaintiff excepts on the ground that the master has not allowed interest to the claimants, upon their respective demands, either from the time of the dissolution of the charter, or from the time of the filing of this bill. But the court are of opinion that the decision of the master was correct, for the reasons which were given in the case of *Crease* v. *Babcock*, (*ante*, 568.)

2. By the 1st and 4th exceptions which are very similar, the defendants object to the master's report, because he allowed, as valid claims of holders of bank bills, sundry promissory notes of the Nahant Bank, which do not appear to have been issued as currency, or to answer the purpose of bank bills within the meaning of the statute which makes stockholders personally liable, but, on the contrary, to have been issued upon unlawful agreements that the same should not be presented for certain fixed periods, so as to answer the purpose of promissory notes on time, and to have been discounted for loans issuing to said bank, at usurious rates of interest.

The grounds upon which these exceptions are founded, as we understand them, are, not that these bills were obtained at the bank, or immediately from the officers of the bank ; but that they were purchased of brokers, under an understanding that they should not be returned to the bank within some

limited terms, and that they were purchased at various rates of discount. They were, however, bank notes in the usual form, payable at the bank, on demand, to the bearer. On these grounds, it is argued that the purchasers of these bills had reason to believe that the persons of whom they purchased were agents of the bank, and therefore that such purchases constituted usurious and unlawful contracts between the purchasers and the bank. But the evidence, we think, does not warrant this conclusion. Bank bills are intended to circulate in the freest possible manner, to pass by mere delivery, and constitute a species of security of which possession is proof of property. It is often impossible for a *bonâ fide* bill holder to produce any other evidence of title. On the former hearing of this case, it was decided, that the purchase of a bank bill at a discount, and even on an agreement of the purchaser to withhold it from going into the bank for a certain time, was not evidence from which an inference could be drawn, that the contract was made with the bank, or for account of the bank. It is quite consistent with the supposition that the seller has some purpose of his own to subserve, in preventing such bills from being returned. To deprive the holder of the benefit of such security, it must appear that he has obtained the bill by fraud or collusion with the officers or agents of the bank, or received it of a party who has so obtained it, with actual notice of the fact. These exceptions, therefore, cannot be sustained.

3. The next exception taken by the defendants is, that the notes above described were allowed in full, without deducting threefold the interest taken thereon, according to the statute against usury. Rev. Sts. *c.* 35, § 2.

If we are right in the view we have taken above, the holders of these notes were purchasers from those who had an apparent title by possession; there was no contract in the purchase, between them and the bank, and of course no usurious contract. If this were in other respects a case for the application of the statute providing for the deduction of three times the amount of interest taken or reserved on a usurious

contract, we think the facts proved in this case are not such as to warrant it.

4. The next exception is, that the master allowed the claims according to the face of the bills presented and proved, without deducting any thing for the discount, when they were purchased at a discount; whereas he should have allowed only the amount which the claimants respectively paid for the bills.

In this respect we think the decision of the master was right. In the case of *Crease* v. *Babcock*, it was held that the right to recover of the stockholders was not limited to those who held one or more bills at the time of the dissolution of the charter; but that they might continue in circulation, and that the right to the remedy against stockholders was incident to the bills and passed with them, and that the production of the bills was proof of title. If the original holder had proved the bills, he would recover the whole amount. His transfer to another is not a mere equitable assignment, but is an entire transfer of the whole legal and equitable title; and we think, therefore, that such a holder is entitled to recover the par value, as the original owner would have done.

5. The next exception is, that the master has allowed the full amount of certain bank bills which had not been proved against the assets of the bank in the hands of the receivers; whereas he ought to have charged against the same the amount of the dividends which the holders of such bills would have received if they had so proved, by means of which the claims against the stockholders individually would have been reduced by the like amount.

This exception, we think, is well taken, and must be sustained. The first and natural fund for the payment of the debts of the bank is the assets of the bank itself. The stockholders are liable in their individual capacity, by force of the statute upon which this bill in equity is founded, for the bills "which shall remain unpaid." A reasonable construction of this clause, we think, is, shall remain unpaid after other means, which are first liable, shall have been applied and

proved insufficient.   We are of opinion, therefore, that these claimants ought not to recover a larger amount against these individual stockholders, than they would have done had they presented their claims to the receivers and taken a dividend in common with the general creditors.

It was intimated, that this case might fall within a rule in equity, that where one creditor has a claim upon two funds, and other creditors upon one of them only, he may charge the whole of his claim upon the fund not chargeable to the other creditors, so as to leave them a larger share of the common fund ; *Kendall, ex parte,* 17 Ves. 520, and *Dorr* v. *Shaw,* 4 Johns. Ch. 17 ; so that these bill holders, having a claim upon the general fund, and also against the stockholders in their private capacity, might claim their whole amount of the private stockholders, leaving a larger amount of the general assets to the other creditors, who have no such claim on the stockholders.   But we think the rule does not apply, because the two funds are not equally liable ; but that the statute establishes an order of priority, by which the individual stockholder becomes secondarily liable only, after the prior fund has been exhausted.   This exception, we think, must be sustained.

The case was recommitted to the master, who made a second report, on which a final decree was passed on the 10th of April 1845.